| | | |
|---|---|---|
| KEVIN L. FRENCH, | ) | |
| | ) | |
| Petitioner, | ) | No. 3:16-cv-00552 |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER BRUN, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 filed by Petitioner Kevin French, a state prisoner incarcerated at the Turney Center Industrial Complex in Only, Tennessee. (Doc. No. 37). Petitioner challenges his conviction and sentence in the Davidson County Criminal Court for one count of first-degree premeditated murder, one count of first-degree felony murder, and one count of especially aggravated robbery for which Petitioner is serving consecutive life sentences plus fifty years in the Tennessee Department of Correction. See State v. French, No. M2013-01270-CCA-R3-CD, 2014 WL 3530947, at *1 (Tenn. Crim. App. July 16, 2014). Respondent has filed an Answer to the habeas petition (Doc. No. 42)[1], and Petitioner has filed a Reply in opposition to the Answer (Doc. No. 46).

The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. See Christian v. Hoffner, No. 17-2105, 2018 WL

---

[1] Petitioner alleges that "Respondent did not actually address Petitioners [sic] 2254 . . . Petitioner would ask that this court review the 2254 and it[]s amendments filed by the petitioner." (Doc. No. 46 at PageID# 3490). While Petitioner is correct that Respondent, in his Answer, cites to Petitioner's original habeas petition (see, e.g., Doc. No. 42 at PageID# 3382) (citing Doc. No. 1 rather than Doc. No. 37)), Respondent's Answer responds to each of the four claims raised in Petitioner's amended petition. Two of these claims, prosecutorial misconduct and Brady claims, were not raised by Petitioner in his initial petition. Thus, it appears Respondent simply cited to the wrong petition in his Answer.

4489140, at *2 (6th Cir. May 8, 2018) ("A district court is not required to hold an evidentiary hearing if the record 'precludes habeas relief.'") (quoting <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007))). The petition therefore will be denied, and this action will be dismissed.

## I. PROCEDURAL HISTORY

Following a jury trial, French was convicted by a Davidson County Criminal Court on first-degree premediated murder, first-degree felony murder, and especially aggravated robbery for the killing of the victim, Andre Veals. <u>State v. French</u>, No. M2013-01270-CCA-R3-CD, 2014 WL 3530947 (Tenn. Crim. App. Jul. 16, 2014), <u>perm. app. denied</u> (Tenn. Nov. 20, 2014). Petitioner was sentenced to an effective sentence of life imprisonment in the Tennessee Department of Correction. <u>Id.</u>

On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's conviction and sentence on appeal. <u>Id.</u> The Tennessee Supreme Court subsequently denied discretionary review. <u>Id.</u>

In January 2015, Petitioner filed a petition for post-conviction relief (Doc. No. 41-1 at PageID# 2581-2590), which was denied following a hearing. (Doc. No. 41-2 at PageID# 2713).

On March 7, 2016, while his post-conviction proceedings were ongoing in the trial court, Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in this action. (Doc. No. 1). The Court stayed the federal court proceedings until the completion of post-conviction review in state court. (Doc. Nos. 21, 22).

The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief, and the Tennessee Supreme Court denied discretionary review. <u>Kevin L. French v. State of Tennessee</u>, No. M2019-01766-CCA-R3-PC, 2021 WL 1100765 (Tenn. Crim. App. Mar. 23, 2021), <u>perm. app. denied</u> (Tenn. Jun. 11, 2021).

2

Upon the conclusion of state post-conviction review, Respondent notified the Court (Doc. No. 36), and Petitioner filed an amended habeas corpus petition (Doc. No. 37)[2] and a Motion to Appoint Counsel (Doc. No. 38). The Court denied Petitioner's Motion to Appoint Counsel and reopened the case. The Court directed Respondent to file a response to the amended petition. (Doc. No. 39). Respondent complied with the Court's instructions (Doc. Nos. 40, 41, 42; see supra n.1), and Petitioner filed a Reply to Respondent's Answer (Doc. No. 46). In addition, Petitioner filed a Motion for an Evidentiary Hearing. (Doc. No. 45).

By Memorandum Opinion and Order entered on July 22, 2022, the Court denied Petitioner's Motion for an Evidentiary Hearing. (Doc. No. 50). Thereafter, Petitioner sought reconsideration of that decision (Doc. No. 52), which the Court denied by Memorandum Opinion and Order entered on September 22, 2022 (Doc. No. 54). Petitioner subsequently filed a Motion to Correct an Error in the Court's Reconsideration Decision (Doc. No. 55) and a Motion to Supplement the Record (Doc. No. 56). By Memorandum Opinion and Order entered on August 18, 2023, the Court granted Petitioner's Motion to Correct Error, noting a nomenclature error in the Court's prior order but declining to revisit the prior decision. (Doc. No. 59). The Court also denied without prejudice the Motion to Supplement the Record but directed Respondent to file a response on the status of certain filings purportedly made by Petitioner during the post-conviction appeal to the state appellate courts. (Id.)

Petitioner then filed another Section 2254 petition in this Court: Kevin L. French v. Debra Johnson, Case No. 3:23-cv-00304. Pursuant to governing law in this Circuit, the Court construed Petitioner's second-filed Section 2254 petition (filed in Case No. 3:23-cv-00304) as a motion to amend his first petition and directed Respondent to file a response to the construed motion to

---

[2] This petition is the operative petition before the Court at this time.

amend the petition (Doc. No. 58). By Memorandum Opinion and Order entered on August 15, 2024, the Court denied Petitioner's request to amend. (Doc. No. 87). The Court also denied various motions filed by Petitioner, including a second Motion for an Evidentiary Hearing. (Id.)

## II. STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's trial as follows:

> This case concerns the November 16, 2008 especially aggravated robbery and murder of Andre Veals. Appellant and Leangelo L. Ramey were indicted by a Davidson County grand jury on September 10, 2010, for premeditated murder, felony murder, and especially aggravated robbery. The parties presented the following evidence at appellant's September 2012 trial.
>
> Metro Nashville Police Officer Adam Weeks testified that on November 16, 2008, he was dispatched "just before 3:00 p.m." to a shooting in progress at Carl's Car Wash on Gallatin Pike in Davidson County. He found the victim lying on the ground. Medical personnel arrived shortly thereafter. Officer Weeks secured the crime scene and began logging potential witnesses and other responding officers. In a photograph of the crime scene, Officer Weeks identified appellant's brother, Jonathan French, who was standing outside the crime scene tape talking to an investigator. He also identified several photographs of a tan Chevrolet Trailblazer registered to the French family, which was parked beside the car wash.
>
> Kimberly McLemore testified that she was vacuuming her car's interior at the car wash that day, and she observed a young man—the victim—walk by her car, talking on a cellular telephone. She then saw a car "that still had soap all over it" drive out of a wash bay. The car was "four door, metallic blue [,] ... set up high on tires and r[i]ms." The car stopped by the victim, and the driver opened his door. Ms. McLemore said that the victim and the driver conversed but that she could not hear their words over the vacuum cleaner. She continued to vacuum but also looked toward the two men occasionally because they were near sports equipment that she had placed on the ground. Ms. McLemore testified that she then heard three gun shots and that she dived into her car. She heard "tires screeching" and saw the victim "staggering ... like he was trying to walk away." Ms. McLemore said that she "was screaming" and "was frantic." She saw the victim "drop[ ] to his knees." She said that the blue car tried to run over the victim, "but they couldn't, so the tires were spinning out." She continued, "And as the tires continued to spin as they were trying to go forward, they just ran over him." Ms. McLemore testified that she did not know who fired the shots. She described the driver of the blue car as "a black male" wearing "a black stocking cap." Ms. McLemore said that she was "[v]ery close" to the gunfire and that there was a bullet hole in her car from the incident.

4

Ms. McLemore further testified that on November 20, 2008, she met with Detective Paul Harris to attempt to identify someone involved in the shooting. She said that in a photographic lineup, she circled "the gentleman ... [who] looked familiar to me, [who] was driving the blue car." Ms. McLemore agreed that she told Detective Harris, "'100 percent sure, no, but I do believe that's the guy I saw.'" She testified that she had been watching both the driver of the blue car and the victim because she "didn't know if these guys were going to steal [her softball equipment] or what, so [she was] constantly looking out of [her] car to make sure ... that they [didn't] get [her] stuff" and that "some people you just don't forget."

Terry Eubanks testified that on November 16, 2008, he was visiting friends approximately one block from the car wash where the victim died. He recalled seeing a car driving down the street that "had soap suds all over it." Soon thereafter, he saw the same car driving the opposite direction, back to the car wash. Mr. Eubanks described the car as "a Ford, blue with big black r[i]ms on it." He said that he could not see who was inside the car because the windows were tinted. Shortly after seeing the car for the second time, Mr. Eubanks said that he heard "several shots, then the car came flying back down the street."

Ivory Kelly testified that he was at the car wash when the victim was murdered. Mr. Kelly said that he was behind the wash bays drying off his car when he saw a blue car pull into a wash bay. A young man, the victim, exited the car and began to wash it. Mr. Kelly then saw "a gold SUV" pull into the car wash parking lot. Two men exited the gold SUV and approached the victim. They spoke, but Mr. Kelly could not hear what was said. He said that it appeared like the men knew each other. Mr. Kelly then saw the blue car back out of the wash bay. He testified that one of the men from the SUV was driving the blue car at that point. The other man from the SUV was left at the car wash and was wearing "a Jamaican cap." Mr. Kelly saw the victim walking across the street, talking on his cellular telephone. The man wearing the Jamaican cap sat in the SUV for a minute and might have been on his telephone. Mr. Kelly said that a few minutes later, the blue car returned and pulled into the wash bay where it had been before. Then, the car backed out and pulled inside another bay. At that point, Mr. Kelly heard two gunshots. Mr. Kelly testified that he saw the blue car "coming out of the stall" and saw "a body rolling up under the car." Then, the second man from the SUV approached Mr. Kelly, so he "jumped in [his] car," drove to AutoZone, and called 9-1-1. Mr. Kelly testified that he tried to identify the men from the SUV in a photographic lineup but was unsuccessful because he did not see their faces well.

On cross-examination, Mr. Kelly admitted that he did not actually see the two men exiting the SUV but that he assumed they had done so. He said that he knew only one person was in the blue car because he could see through the windshield despite the windows being tinted.

Christopher Savage testified that he was acquainted with appellant and had been "real [sic] good friends" with the victim. Mr. Savage testified that both appellant

and the victim had dated a woman named Amanda Crawford. Mr. Savage recalled being at a friend's party on October 25, 2008, which appellant, the victim, and Amanda Crawford also attended. Mr. Savage testified that he witnessed "an altercation in the street between" appellant and the victim. He explained, "[Appellant] ... attempted to walk towards [the victim] with a gun in his hand." Mr. Savage said that appellant appeared angry and that he believed appellant would have attempted to shoot the victim if Ms. Crawford and appellant's brother had not stopped him. According to Mr. Savage, he could not hear anything said by either appellant or the victim, but the area was well-lit. He said that appellant's gun was "black and gray" and was either a .380 caliber or 9mm. Mr. Savage testified that after Ms. Crawford and appellant's brother broke up the altercation, Ms. Crawford and appellant walked back to the house, and the victim stayed by his vehicle.

On cross-examination, Mr. Savage said that when Ms. Crawford was breaking up the altercation, she asked appellant what he was doing and that appellant replied, "'[O]h, so you fixing [sic] to save him[;] you [sic] taking up for him....'" Mr. Savage said that he tried to make peace between appellant and the victim afterwards, but no one said anything. They went their separate ways at that point. Mr. Savage testified that the victim typically drove a maroon Caprice but also owned a blue Crown Victoria.

Metro Nashville Police Department ("MNPD") Lieutenant Frank Ragains investigated the crime scene in this case. He testified that there were blood drops on Ms. McLemore's car and that a blood trail led from her car through a car wash bay to the victim's body. There were also drag or burn marks that showed where the victim "had been hit and was carried by a vehicle." The State admitted photographs of the crime scene and the crime scene diagram through Lieutenant Ragains' testimony. On cross-examination, Lieutenant Ragains testified that he recovered two spent 9mm casings and one live 9mm round from the scene.

Lynn Mace, a crime scene investigator for the MNPD, testified that she processed the gold/tan Trailblazer found at the crime scene for evidence. She lifted fingerprints, which were compared by another individual, and she collected papers that had appellant's name on them, including a pay stub and a social security card. She did not recall finding any papers bearing the names Eric French, Jonathan French, or Leangelo Ramey. Felicia Evans, also a crime scene investigator, testified that she attempted to lift fingerprints from the shell casings found at the scene but was not successful. MNPD fingerprint examiner Larry Farnow testified that he compared fingerprints collected from the tan Trailblazer with known fingerprints of appellant and Leangelo Ramey. The fingerprints matched those of appellant.

Tennessee State Trooper Kasey Fitts testified that in November 2008, he was employed by the Millersville Police Department. In that capacity, he was dispatched to a vehicle fire on I–65 North near mile marker 100 on November 16, 2008. He arrived at 8:07 p.m. and observed a Ford Crown Victoria "fully engulfed in flames." He ran the vehicle tag number and learned that the vehicle had been

6

listed as stolen. The fire department extinguished the fire, and the vehicle was towed away.

Retired MNPD Detective Johnny Lawrence testified that he processed the victim's "burned out vehicle" for evidence. He collected fingerprints, "but they were not good quality." He also swabbed the door handles for DNA evidence. Detective Lawrence said that he "[c]ollected some possible human tissue ... from the right rear wheel area." He also found blood on the underside of the vehicle.

MNPD Detective Warren Fleak testified that he executed a search warrant at a residence on East Marthona Road that was associated with appellant. He recovered a nonfunctional Larsen .380 semi-automatic pistol, a Colt Cobra .38 special revolver, and a Glynnfield model 778 12–gauge shotgun from the residence. The .38 special and the shotgun were both loaded. Detective Fleak also recovered additional ammunition: .38 special rounds, 12-gauge rounds, and .32 auto rounds.

Tennessee Bureau of Investigation ("TBI") Special Agent and forensic scientist Shelly Betts testified as an expert in firearms and toolmark identification. She compared the fired bullets from the crime scene with firearm evidence recovered from East Marthona Road and Banberry Drive (residence of co-defendant Ramey's mother). She said that the 9mm ammunition collected from Banberry Drive were from a different manufacturer than the ammunition recovered at the crime scene and that the one fired cartridge case from Banberry Drive did not have the same markings as ammunition from the crime scene. Agent Betts also said that the fired cartridge cases from the crime scene had not been fired from any of the firearms collected at East Marthona Road. Agent Betts testified that the 9mm cartridge cases found at the crime scene had been fired from the same weapon and that "the markings that were found on those cartridge cases are typical of what we see when a cartridge is fired in a Highpoint firearm." The unfired 9mm cartridge from the crime scene was from the same manufacturer and was the same type as the fired cartridges from the crime scene.

MNPD Officer William Stewart testified that he spoke to appellant at the crime scene on November 16, 2008. Officer Stewart said that appellant approached him to ask when he would be able to recover his mother's car, which was inside the crime scene. Appellant also told Officer Stewart that he knew the victim and that the victim's car was across the street. However, the car to which appellant pointed was not a blue Crown Victoria. Officer Stewart could not recall the make and model of that car.

On cross-examination, Officer Stewart said that he spoke with the people inside the car to which appellant had pointed, whom he learned were the victim's mother and girlfriend. They showed him paperwork indicating that the car was owned by the victim. Officer Stewart agreed that the car might have been a burgundy Caprice.

MNPD Detective Curtis Hafley testified that he was dispatched to the crime scene on November 16, 2008. Subsequently, he went to the residence of appellant's parents on Forrest Avenue to ascertain the location of a Chevrolet Suburban. He explained that he "was just going simply to find" the vehicle and that he had no other information about it. While at the residence, Detective Hafley spoke with appellant's parents. They called appellant, and Detective Hafley spoke with appellant by telephone. Detective Hafley returned to the scene and spoke with appellant in person at the parking lot across the street from the car wash. Appellant told Detective Hafley that he had driven the Trailblazer earlier that day but that he had exchanged vehicles with his brother because his brother had planned to wash the Trailblazer. Appellant said that the vehicle exchange took place on Andy Street, at a house where appellant was going to have his hair styled. Appellant further stated that after he left the house on Andy Street, he received a telephone call about the Trailblazer. Detective Hafley said that he found it unusual that appellant was not wearing a jacket that day because "[i]t was the coldest day of the year." He also recalled commenting to appellant that appellant had not stayed to get his hair styled "because his hair was not freshly fixed." Detective Hafley said that the Trailblazer did not appear to have been recently washed.

MNPD Detective Paul Harris testified that he was the lead investigator in this case. He said that while he was at the crime scene, he was told that a 9-1-1 caller had "notified dispatch that the persons responsible for this had arrived in a gold Chevy [T]railblazer." He also testified that the victim had called 9-1-1 himself. The following day, the victim's car was discovered by the Millersville Police Department, and Detective Harris had the vehicle brought to Nashville. Detective Harris testified that during the course of his investigation, he developed appellant as a suspect. He said that he showed a photographic lineup to Ms. McLemore, who identified appellant's photograph.

Detective Harris interviewed appellant on November 25, 2008, outside of the East Marthona residence. Appellant told him that on the day of the victim's murder, he had driven his brother's Expedition because his brother had taken the Trailblazer that appellant typically drove. Appellant did not mention a vehicle exchange. Appellant also said that he had gotten his hair braided at a location on Riverside Drive. While at the Riverside Drive location, appellant said that he received a call from James Crawford on a friend's telephone informing him that his Trailblazer was inside a crime scene. Appellant explained that he had left his cellular telephone at his Forrest Avenue house and that his telephone was in the same place when he returned home as it was when he left. He told Detective Harris that he spoke with his brother, Jonathan French, once on November 16, while Jonathan French was driving to a restaurant. Appellant said that the last time he had seen the victim was at James Crawford's birthday party and that appellant had an altercation with Christopher Savage at the party. Appellant denied having a gun at Mr. Crawford's party and said that he did not "own a gun ... [had] never even touched a gun in his life."

Detective Harris testified that he interviewed appellant again at the East Marthona address on May 19, 2009. Sergeant Postiglion was also there and did the majority of the questioning. In that interview, appellant was asked whether anyone had borrowed his cellular telephone on the day of the murder, and appellant responded that no one else used his telephone. The recording of the May 19 interview was played for the jury. In the recording, the police officers told appellant that his cellular telephone "ping[ed] off a tower" in Millersville, where the victim's car was found. Detective Harris testified that the police had obtained appellant's cellular telephone records via a subpoena, and the State introduced those records, along with the telephone records of the victim, Amanda Crawford, and Jonathan French, into evidence.

On cross-examination, Detective Harris testified that the police searched two locations associated with co-defendant Leangelo Ramey, one of which was Banberry Drive, where the police found twenty 9mm live rounds and one 9mm cartridge casing. Regarding the weapons found at appellant's East Marthona residence, Detective Harris testified that he knew before the search that weapons would be in the house and that he had been told by numerous people that appellant was "frequently armed and carrie[d] firearms." However, he agreed that the weapons found at East Marthona were not registered to a particular person.

On re-direct examination, Detective Harris recalled that Amanda Crawford told him that appellant pulled a gun on the victim at James Crawford's party. He could not remember whether James Crawford and Christopher Savage had also seen the gun. Regarding the victim's 9-1-1 call, Detective Harris testified that he obtained a recording of the call by recording it himself while the communication center played their recording for him over the telephone.

On recross-examination, Detective Harris agreed that the victim told the 9-1-1 dispatcher, "'[S]omebody just stole my car and robbed me at gun point.'" He further agreed that the victim gave "additional address and car information," then said, "'[H]old on, now he [sic] pulling back in the parking lot[;] they [sic] playing with me, man, just send the police.'" Finally, Detective Harris agreed that the victim did not mention the name of the person who had taken his car.

TBI Agent Michael Frizzell testified as an expert in the field of communication records in criminal investigations. He explained that "pinging" means that a cellular telephone registers with a network by transmitting a paging signal to the network so that the network knows the location of the telephone. This information allows the network to use the cellular site closest to the telephone to communicate with that telephone. Agent Frizzell said that a cellular telephone will ping if, for example, a call is made or received, a text message is sent or received, or if a smartphone application updates itself. However, sometimes the networks will "load shift[ ]" during high-volume periods by sending the signal to the next-closest tower. Agent Frizzell testified that he reviewed telephone records associated with appellant, Amanda Crawford, and Jonathan French and prepared a synopsis of the

9

calls between appellant's telephone and the other two. In particular, the State pointed out calls from appellant to Amanda Crawford at 12:59 p.m. and 10:17 p.m., calls from appellant to Jonathan French at 2:22 p.m. and 5:19 p.m., and calls from Jonathan French to appellant at 10:46 a.m. and 2:16 p.m. On cross-examination, Agent Frizzell admitted that he did not know who had possession of appellant's telephone on the day of the murder. He acknowledged that appellant's telephone records indicated that his telephone called numbers that later testimony showed belonged to Montez Jennings and Mr. Jennings' girlfriend.

David Kline, an employee with the Metropolitan Planning Department's mapping division, testified that he prepared several maps for the State showing locations of interest in this case. In particular, he plotted on a map the locations of Carl's Car Wash, the victim's burning car, and cellular towers pinged by appellant's telephone. He said that he plotted the cellular towers based on appellant's telephone records and information in a database regarding the location of cellular towers. According to the information he received, appellant's cellular telephone pinged a tower near where the victim's burning car was found at the following times: 5:42:01 p.m.; 8:03:22 p.m., 8:10:34 p.m., and 8:11:36 p.m. Mr. Kline also plotted the towers pinged by Jonathan French's telephone. Jonathan French's telephone pinged the tower near where the victim's burning car was found at the following times: 5:53:02 p.m., 5:53:28 p.m.; 5:55:15 p.m.; 5:58:55 p.m.; and 5:59:29 p.m.

Montez Jennings testified that he had known co-defendant Leangelo Ramey since he was ten or eleven years old and that he did not know appellant. Mr. Jennings said that Ramey told him "that he robbed a guy, he shot him[,] and he ran him over[,] and he burned his car." Mr. Jennings testified that Ramey also showed him a weapon, which he described as a smaller caliber, all-black gun. He believed it "was like a .9 millimeter or something." He said that around the time of the victim's murder, Ramey had shoulder-length dreadlocks and drove a white Dodge Dynasty.

On cross-examination, Mr. Jennings said that Ramey came to his apartment the day after the victim's murder. Ramey "told [him] about the incident at the car wash" and showed him a weapon. After that conversation, Mr. Jennings made him leave the apartment. While they were outside of the apartment, Ramey repeated his story. Mr. Jennings had no contact with Ramey after that day except for seeing him briefly at a shopping mall. Mr. Jennings said that he was not afraid of Ramey but "was scared of the whole situation." He said, "[A]ll I know is that he told me that he killed someone." He stated that Ramey had been "kind of ... crazy" when they were growing up and that he had "[m]ood swings and ... real erratic behavior." He had never known Ramey to carry weapons, however. Mr. Jennings did not recall whether Ramey called him the night of November 16, 2008, but he acknowledged that the records shown to him by defense counsel displayed calls to his telephone number and to his girlfriend's telephone number.

Keyosha Blair testified that she had a son with appellant. She stated that she did not know appellant in November 2008 and that they met sometime in 2009. She said

10

that after he was incarcerated, they continued to communicate, mostly about their child. Ms. Blair testified that appellant asked her "to say that he was with [her] at the time" of the victim's murder, despite her not having met him yet. Ms. Blair identified a letter that she said appellant sent her from jail in which appellant told her to say that she was with him while he was getting his hair braided and that he picked her up in an Expedition.

TBI Special Agent Jennifer Shipman analyzed several exhibits in this case for DNA. She testified that the four swabs from underneath the victim's car were positive for the presence of blood. Further testing of one of the swabs revealed DNA that matched the victim's DNA.

Leangelo Ramey, appellant's co-defendant, testified as a witness for the State. He said that he had known appellant for more than a year prior to the victim's murder. He described appellant as a friend and said that appellant helped him find work. Ramey testified that he spent the night on November 15-16, 2008, at appellant's house, which was located on a street beginning with the letter "M" in the Madison area. Ramey said that appellant picked him up on November 15 in a brown, four-door sedan.

Ramey said that the next day, he asked appellant for a ride to a friend's house. Ramey said that they left appellant's house in appellant's Trailblazer. Instead of taking Ramey to his friend's house, however, appellant stopped at a car wash off Gallatin Pike. Ramey testified that appellant parked next to the car wash, not inside one of the wash bays, and left the vehicle. Ramey said that appellant did not tell him why they had stopped. He waited for appellant to return, but after "a little while," he got out of the vehicle to look for appellant. Ramey said that he first went to the back of the car wash and then to the front. He did not see appellant at first. Instead, he saw a blue car pass him that had "a lot of soap on it." He testified that he could not tell who was driving the blue car. Fifteen to twenty seconds later, he heard two gunshots and then "a big vroom ... like just a loud roar of a car." Ramey said that he started moving toward the back of the car wash when he saw "the vehicle and [saw] a body rolling from ... up under the vehicle coming [his] way full speed." Ramey testified that he saw appellant in the driver's seat. Appellant drove away from the car wash "up towards Dozier." Ramey said that at that point, he was in "a state of panic," so he walked away from the car wash and went to his friend's house.

Ramey testified that he stayed at his friend's house for a time, then he called appellant from his friend's telephone to ask for a ride home. Appellant told him "that he would get in touch with [Ramey] when ... he [got] a chance." Ramey explained that he called appellant because he was the only person who would give him a ride. When appellant picked him up, appellant was driving the brown sedan he had driven the previous day. On the way to the home of Ramey's girlfriend, appellant gave Ramey a cellular telephone that Ramey assumed was his.

11

Later, appellant called Ramey on that telephone from a number Ramey believed was that of appellant's brother. In that conversation, appellant asked Ramey to do something for him but did not elaborate. Ramey drove his own car to appellant's house in the Madison area. When he arrived, appellant told him "to go pick up the car" at a particular apartment complex. Ramey explained that "the car" was "the blue car from the car wash." Ramey found the blue car and began driving it towards where appellant wanted him to go, but he got lost. He called appellant, who told him that he would "be there in a minute." Appellant arrived and gave him directions to the interstate. Ramey said that he drove onto the interstate and headed away from Nashville. Ramey testified that he called appellant "a couple of times" to tell appellant that he did not know where he was going. Appellant told him, "'[J]ust drive[.]'" Eventually, Ramey pulled over to the side of the road, and appellant came to pick him up. At that point, appellant was driving a white SUV that Ramey believed belonged to appellant's brother. Appellant took Ramey back to Ramey's car. Ramey testified, "[T]hat's the time when he told me I need to get rid of the car." Ramey said that appellant specifically told him to burn the car. After appellant dropped him off at his car, Ramey obtained a gasoline can and gasoline, then drove back to the blue car. He poured the gasoline in the car and lit it on fire. Ramey said that he drove away but had to call appellant several times for directions. He met appellant to return appellant's telephone.

Ramey testified that he continued to spend time with appellant after November 16 but not as often. Ramey recalled that appellant asked him not to tell anyone anything. Every time he saw appellant thereafter, appellant asked him whether he had talked to the police. He said that appellant's brother was with appellant once when appellant asked Ramey about talking to the police. When the police contacted Ramey, he did not tell them anything at first. The second time he spoke with the police, Ramey told them that he had been at the car wash with appellant but that he had not seen anything. He admitted that he did not tell them the truth but stated that he was afraid that he would "end up like [the victim]." Ramey said that he never called Montez Jennings on November 16, 2008, did not visit Mr. Jennings the next day, and did not show Mr. Jennings a gun at any point. Ramey testified that he did not remember the clothing that he and appellant were wearing the day of the murder but recalled that he wore his hair in dreadlocks and that appellant wore his hair in cornrow braids. He remembered that appellant was wearing a black hairnet-like cap.

On cross-examination, Ramey testified that his mother lived on Banberry Drive and that he might have had possessions stored at her house. He denied that the 9mm bullets found at that address were his. Ramey said that he did not have a cellular telephone when he was at the car wash. When asked whether he had made any "deals" with the State, Ramey said that he had not. However, he agreed that he signed an immunity agreement with the State whereby his testimony at appellant's trial would not be used against him. Ramey testified that he burned the car for appellant because he believed that he would be "dealt with if [he] said anything or [if][he] didn't cooperate with [appellant]." He further testified that he was not afraid

of appellant because he did not do anything to make appellant mad. On redirect examination, Ramey clarified that his charges were still pending and that he would be tried for first degree murder and especially aggravated robbery.

The State next presented information about the victim's 9-1-1 call. The custodian of records for the Nashville Emergency Communication Center testified that the center's recording of the victim's call had been purged from their system, pursuant to their standard practice, in January 2012. The victim's mother testified that she had listened to a 9-1-1 recording and identified the victim's voice on it. The 9-1-1 recording, apparently the same recording made by Detective Harris, was played for the jury.

Deputy Chief Medical Examiner Dr. Adele Lewis testified that she performed the victim's autopsy and determined that his "cause of death was a gunshot wound to the torso and multiple blunt force injuries." She specified that the bullet entered the left side of the victim's chest and exited on the right side, breaking three ribs and going through his heart, right lung, and liver. Dr. Lewis testified that the victim had many scrapes and bruises, "some bleeding in the deep soft tissues of the scalp," and "very severe pelvic fractures." Dr. Lewis explained that the victim's "bones in the front of the pelvis were broken and separated from each other, as were both of the bones in the lower part of the back broken and separated from each other." She opined that "a great deal of force" was required to cause the pelvic fractures. Dr. Lewis described the abrasions to appellant's lower back and buttocks as "road rash." In addition, the victim had an injury to his abdomen that "might [have] been a burn." Using autopsy photographs—Exhibits 41A-H—and a photograph from the crime scene—Exhibit 7C, Dr. Lewis described the victim's various injuries to the jury. Following her testimony, the State rested its case.

Amanda Crawford testified on behalf of appellant. She said that he did not pull a gun on the victim during the party in October 2008 and that she would have been the only person close enough to see if he had. Ms. Crawford admitted that she had seen appellant with a gun during a New Year's Eve celebration, when "everybody was shooting" guns at midnight.

On cross-examination, Ms. Crawford testified that she dated the victim for "a couple [of] months" but had been in a relationship with appellant "off and on" since she was sixteen years old. Ms. Crawford agreed that when Detective Harris interviewed her on November 18, 2008, she initially told him that appellant did not pull a gun on the victim at the party but later admitted that he had done so. Ms. Crawford further agreed that she told Detective Harris that appellant "carrie[d] a gun quite often." Regarding appellant and his brother, Ms. Crawford agreed that she told Detective Harris that she had never known appellant's brother to drive appellant's vehicle nor appellant to drive his brother's vehicle without his brother also being in the vehicle.

Jonathan Eric French, appellant's brother, testified that on November 16, 2008, he went to his parents' house on Forrest Avenue to pick up the family's Trailblazer, which he said was silver, so he could clean it. He took it to Carl's Car Wash and parked it on the side. He recalled seeing a vehicle leave that still had soap on it. Jonathan French also heard gunshots, so he left the car wash and went to AutoZone to purchase a car part. However, the store did not have the part he wanted. When he tried to go back to the car wash, it had been cordoned off. Eventually, he was taken to the police precinct for questioning. He said that the police began questioning him at 3:00 or 4:00 p.m. and that the questioning lasted four to six hours. After the police took him home, he went back to the crime scene with his parents and stayed until the Trailblazer was towed. He said that he did not have his cellular telephone with him that day.

On cross-examination, Jonathan French said that he did not see how his interview could only have lasted "one hour and [fifty-seven] minutes and [thirty] seconds," which was the length alleged by the State. When asked whether it would surprise him if Detective Harris had watched the surveillance video from AutoZone and never saw him in the store, Jonathan French said, "I'm pretty sure he'd seen me if he pulled it."

Mary French, appellant's mother, testified that the police came to her house on November 16, 2008, but never told her why. While the officers were there, appellant called her. The police talked to appellant over the telephone. Mrs. French went with her husband and Jonathan French to Gallatin Pike between 5:30 and 6:00 p.m. On cross-examination, Mrs. French said that she owned houses on Forrest Avenue and Marthona Road and that her sons sometimes stayed at Marthona Road and sometimes at Forrest Avenue. She could not recall whether appellant or Jonathan French were at her house on Forrest Avenue when she awoke on November 16, 2008.

Archie French, II, appellant's brother, testified that on November 16, 2008, two police officers came to his mother's house looking for appellant. The officers learned that appellant was at a tobacco store across the street from the car wash, so Archie French met appellant at the tobacco store "a little bit before 4:30." Archie French said that he and appellant waited there until the Trailblazer was towed.

On cross-examination, Archie French said that when Jonathan French and their parents arrived, he and appellant went to get a digital camera from Archie French's house, to get batteries for the camera, and then back to his house to charge the camera when they could not find appropriate batteries. They returned to the crime scene, and he took photographs of the area. He agreed that he had never told anyone that he knew where appellant was the entire afternoon. After Archie French's testimony, the defense rested.

The State recalled Detective Harris as a rebuttal witness. He said that he had reviewed the videotaped interview with Jonathan French and found that the

timestamp indicated the interview lasted one hour and fifty-seven minutes. Detective Harris stated that the videotape represented the full extent of Jonathan French's questioning. Detective Harris testified that Jonathan French told him during that interview that he had gotten in the wrong line at the auto parts store, so he left rather than wait in another line.

Detective Hafley also testified as a rebuttal witness. He said that he transported Jonathan French from the police precinct to his home and that he recorded the entire interaction. He "timestamp[ed]" the end of the recording by stating the time he dropped off Jonathan French, which was 6:12 p.m.

After the close of proof and deliberations, the jury found appellant guilty of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. He received life sentences for the murder convictions, and the trial court sentenced him to a concurrent sentence of twenty-one years for his especially aggravated robbery conviction.

State v. French, No. M2013-01270-CCA-R3-CD, 2014 WL 3530947, at *1 (Tenn. Crim. App.

July 16, 2014).

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's

post-conviction hearing as follows:

In January 2015, the Petitioner filed a timely pro se petition for post-conviction relief, followed by two amended petitions through subsequently appointed counsels as well as a second pro se petition which was deemed an appendix to the second amended petition. Relevant to this appeal, the Petitioner argued that he received ineffective assistance of counsel due to counsel's failure to seek suppression of his cellphone records; seek suppression of the fruits of the searches of two residences associated with him; object to the State's mischaracterization of Ms. McLemore's testimony in its closing argument; object to redaction of his taped interview; and effectively cross-examine witnesses. He also argued that he received ineffective assistance with regard to his direct appeal because four of the issues presented to this court were deemed to be waived for having not been included in the motion for new trial. The Petitioner additionally claimed that the State committed prosecutorial misconduct in closing argument; the State committed a Brady violation, i.e., withheld exculpatory evidence; and that he is actually innocent.

The post-conviction court conducted an evidentiary hearing, at which Detective Paul Harris with the MNPD testified that on November 19, 2008, he applied for a court order to obtain cellphone records for phone number 615-730-1410 from November 1, 2008, to November 19, 2008, which the trial court granted. In the application, Detective Harris referenced the Stored Communications Act, 18 U.S.C. 2703, as the statutory authority for the application. Detective Harris recalled that

15

the cellphone records were used at trial "to corroborate what the co-defendant testified to."

Detective Harris also applied for a search warrant to search a residence at 332 East Marthona Drive in Madison, Tennessee, for "any nine-millimeter pistol or device capable of firing a nine-millimeter projectile. Any and all nine-millimeter ammunition to include live rounds, projectiles and shell casings." He explained that searching for those items was important because nine-millimeter cartridge casings were collected from the crime scene and the body of the victim. He acknowledged that the statement of facts in support of the warrant application, which was obtained on September 3, 2009, was based in part on statements he received up until January 26, 2009. During the execution of the search warrant, officers seized several firearms, unfired ammunition of different calibers, marijuana, and a digital scale. Detective Harris said he was unaware if any forensic tests were performed on the firearms to prove that they had been handled by the Petitioner.

Detective Harris acknowledged that one of the applications for a court order to obtain cellphone records referred to a surveillance video taken from a business across the street from the car wash where the murder took place. He agreed that the police took custody of the surveillance video footage at some point and he reviewed it, but he had no knowledge of whether the Petitioner received the recording in discovery. Detective Harris recalled that a portion of the road in front of the car wash could be seen on the video, but the car wash itself could not.

Asked to review the transcript from his testimony at the Petitioner's trial, Detective Harris acknowledged that he testified that Ms. McLemore identified the Petitioner in a photographic array as the person who shot the victim. However, the transcript reflected that Ms. McLemore actually testified that she did not know who fired the shots. At the post-conviction hearing, Detective Harris recalled that Ms. McLemore "was able to view some of the incident while she was in the process of vacuuming," but he could not recall "exactly how she described the events she saw." After reviewing certain documents, Detective Harris acknowledged that when Ms. McLemore viewed a photographic array, she circled the Petitioner's photograph and wrote that she was not "100 percent sure ... [b]ut [she] ... believe[d] that's the guy [she] saw." He additionally acknowledged that it did not appear that Ms. McLemore ever specifically said that she saw the Petitioner shoot the victim.

On cross-examination, Detective Harris agreed that the law pertaining to obtaining cellphone records changed many years after he obtained the cellphone records in the present case. Had the current law, which required a search warrant to procure such records, existed at the time he was working on this case, he would have applied for one. Detective Harris believed that he could have successfully obtained a warrant had case law required it at the time.

On redirect examination, Detective Harris recalled that there was a 911 recording in which the victim called and reported that "[s]omebody stole my car" but did not specifically name the Petitioner.

Detective Curtis Hafley with the MNPD testified that he applied for a warrant to search the residence at 15144 Forrest Avenue on September 3, 2009. In the statement of facts in support of probable cause for the search warrant, Detective Hafley relied on information provided by Detective Harris. Detective Hafley recalled that he interviewed Ms. McLemore at the scene of the shooting. He acknowledged that in the report of the interview, he quoted Ms. McLemore as stating that "[s]he doesn't think she can ID the driver if she saw."

The Petitioner testified to his various grievances with counsel's representation and disputes with the evidence. When discussing his disputes with the evidence, the Petitioner asserted that he was framed by Detective Harris, who the Petitioner claimed knew the identity of the real murderer. Among his complaints regarding counsel, the Petitioner asserted that he told counsel he did not want the State to admit a redacted version of his statement to police at trial. He elaborated that he wanted to introduce the entire statement because it would have offered further explanation for his comment "that I can't stand the police[.]"

The Petitioner said that counsel should have done a better job questioning witness Kimberly McLemore because her testimony was "opposed to physical law." The Petitioner claimed that there were witnesses he wanted counsel to call to testify, namely William Van Buren and Bradley Jaimon Bryant, but counsel "said we don't need them." He alleged that those witnesses gave a description of the suspect as being about twenty-five pounds less than he weighed at the time. The Petitioner then acknowledged that Mr. Bryant testified at trial but that counsel "never questioned him regarding the description[,]" which amounted to ineffective assistance. He agreed that neither Mr. Bryant nor Ms. McLemore identified him as the shooter at trial. The Petitioner discussed a number of other witnesses he wanted counsel to have testify at trial that counsel said were not needed.

The Petitioner also pointed to co-defendant Leangelo Ramey's testimony that the Petitioner picked him up in a Buick LeSabre the night before the incident, as well as right after the incident, but the Petitioner claimed that he did not purchase that vehicle until a month after the incident. He asserted that proof of his car ownership would call Mr. Ramey's credibility into question. However, the Petitioner acknowledged that his mother testified about his purchase of the Buick but said he was not allowed to introduce a supporting document at the trial.

The Petitioner alleged that in its closing argument, the State claimed that Ms. McLemore identified him as the shooter but in actuality, Ms. McLemore "never testified to that, she did not see the shooter." The Petitioner also alleged that he never received the surveillance video from the tobacco store across the street from the scene of the murder in discovery. He asserted that the State relied on this video

17

as the factual basis in its warrant for the phone records of Natasha Lockett and Amanda Crawford.

On cross-examination, the Petitioner recalled that counsel informed him that the State said he was identified by Kimberly McLemore and that Leangelo Ramey was going to testify as a witness against him. With regard to appellate counsel, the Petitioner alleged that appellate counsel failed to raise issues about Ms. McLemore's statement, Detective Harris's "testifying falsely," the 911 call, and Larry Fornow's testimony.

The Petitioner's trial counsel testified that the defense theory of the case was that the co-defendant, Leangelo Ramey, stole the victim's vehicle, drove away in it "with soap blowing off of it down the street," then quickly returned to the car wash, "jumped out and shot [the victim], ran over him and dragged him under the car as he was getting away yet again[.]" Counsel noted that a witness, Montez Jennings, testified that Mr. Ramey confessed to him and showed him a firearm that looked like the type of firearm the evidence indicated was the potential murder weapon. Counsel recalled that he discussed the theory of defense with the Petitioner prior to trial.

Counsel acknowledged that he did not file a motion to suppress the cellphone tower evidence. However, he explained that he spoke with a representative from the phone company and was able to illustrate at trial that "in call times where there were lots of calls, a call may be switched from one call to the other. So questions about the accuracy of ['it pinged off of this tower[,'] that may not always be as reliable as it sounds." He did not file a motion for funding to obtain an expert in the area of cell tower records because he thought that the testimony of the State's witness was going to work adequately in favor of the defense. Counsel acknowledged that he did not research case law regarding the suppression of cellphone records due to failure to obtain a search warrant.

Counsel also acknowledged that he did not file a motion to suppress the searches of the Marthona and Forrest Avenue residences due to staleness of the information or the overly broad nature of the requests. Counsel could not recall why he ultimately decided not to file a motion to suppress, but he conceded that after reading the cases and language cited in the petition for post-conviction relief that "[i]t's a possibility" he should have filed one. Counsel agreed that the recovered items were used at trial to undermine the Petitioner's credibility during the State's closing argument. He also agreed that the Petitioner could have been truthful with the police in 2008 when he said that he did not own any firearms but could have come to possess them by the time the warrants were executed in September 2009.

Counsel agreed that this court on direct appeal ruled that some of the issues appellate counsel raised were waived because they had not been included in the motion for new trial. Counsel noted that appellate counsel did not raise any of the issues that trial counsel had put in the motion for new trial.

18

Counsel testified that he did not receive a copy of a surveillance video from the business across the street from the scene of the murder if one existed and, had one existed, he would have obtained a copy of it so he could determine whether it was of any value to the Petitioner.

Counsel agreed that the State somewhat misstated Ms. McLemore's identification of the Petitioner in its closing argument and that he did not ask for a curative instruction or mistrial. However, counsel recalled that he made a special effort in closing argument to remind the jury that Ms. McLemore did not actually identify the Petitioner as the shooter.

Counsel recalled that co-defendant Ramey mentioned a burnt orange Buick LeSabre in a statement counsel received right before Mr. Ramey testified. The Petitioner's family informed him that they purchased that vehicle about a month after the victim's murder, and counsel asked them to find the title to the vehicle but they were unable to find it. Counsel had the Petitioner's mother testify about the timing of the Buick's purchase, but there was no physical evidence to back up her testimony to show that Mr. Ramey was lying when he said that he was "riding around [with the Petitioner] two days prior to [the murder] in a burnt orange Buick[.]" Counsel felt that he effectively cross-examined Mr. Ramey and "enjoyed the opportunity to try to prove he was lying."

Counsel said that he was not familiar with a witness named William Van Buren who was supposedly at the scene and gave the police a description of an individual he saw with the victim prior to the shooting. The description was of an individual different in size than the Petitioner but consistent with the size of Mr. Ramey. Counsel recalled that he turned a number of names over to his investigator but that it was "not unusual not to be able to find somebody[,] though."

With regard to the Petitioner's interview with the police, counsel noted that "[y]ou couldn't have heard part of what he was saying" because the Petitioner's voice box was injured from a gunshot wound when he was younger.

After the conclusion of the testimony and argument of the parties, the post-conviction court entered a detailed order denying the petition, and the Petitioner appealed.

Kevin L. French v. State of Tennessee, No. M2019-01766-CCA-R3-PC, 2021 WL 1100765, at

*10-13 (Tenn. Crim. App. Mar. 23, 2021).

### III. STANDARD OF REVIEW

19

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." Woodford v. Garceau, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." Burt v. Titlow, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Id.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 405 (2000). Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" Hill v. Curtin, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting Lockyer v. Andrade, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies

the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Harris v. Haeberlin, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520-21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations may be found unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Pouncy v. Palmer, 846 F.3d 144, 158 (6th Cir. 2017) (quoting Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011) (citing Byrd v. Workman, 645 F.3d 1159, 1172 (10th Cir. 2011)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410). Subject to Habeas Rule 7, review under Section 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (citation omitted); Gray v. Netherland, 518 U.S. 152, 162-63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. See Picard v. Connor, 404 U.S. 270, 275 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the Tennessee Court of Criminal Appeals. Adams v. Holland, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). Claims that are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." Alley v. Bell, 307 F.3d 380, 388 (6th Cir. 2002).

A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on the procedural bar as an independent basis for its disposition of the case." Caldwell v. Mississippi, 472 U. S. 320, 327 (1985). Second, if a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is technically exhausted (given that there is nothing additional the petitioner could do to obtain relief in state

court), but a petitioner is not automatically entitled to present his claim on federal habeas review, as his claim is procedurally defaulted. Woodford v. Ngo, 548 U. S. 81, 126 (2006).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." Id. at 386. The burden of showing cause and actual prejudice to excuse defaulted claims is on the habeas petitioner. Coleman v. Thompson, 501 U.S. 722, 750 (1991); Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. Id.

Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. Murray, 477 U.S. at 488-89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. Id. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can be used as cause for the underlying defaulted claim only if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. See Martinez v. Ryan, 566 U.S. 1, 5-6 (2012) (creating an exception to Coleman

where state law prohibits ineffective assistance claims on direct appeal); Trevino v. Thaler, 569 U.S. 413, 429 (2013) (extending Martinez to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); Sutton v. Carpenter, 745 F.3d 787, 792 (6th Cir. 2014) (holding that Martinez and Trevino apply in Tennessee). The Supreme Court's creation in Martinez of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." Martinez, 566 U.S. at 13. In other words, Martinez requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." See id. at 13-15. Importantly, Martinez did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in Coleman.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (2004) (citing

24

<u>Murray</u>, 477 U.S. at 496). A petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>McQuiggin v. Perkins</u>, 569 U. S. 383, 399 (2013) (internal quotation marks omitted) (quoting <u>Schlup v. Delo</u>, 513 U. S. 298, 327 (1995)). For a petitioner to "pass through the gateway" and be permitted to argue the merits of his defaulted claims, he must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." <u>Id.</u> at 401 (internal quotation marks omitted) (quoting <u>Schlup</u>, 513 U. S. at 316).

With these principles in mind, the Court will turn to the examination of the claims raised in French's petition for habeas relief.

## IV. ANALYSIS

Petitioner raises four claims in his amended habeas petition. (Doc. No. 37). Petitioner is not entitled to relief under Section 2254 because his claims are not cognizable under the Habeas Rules, are without merit, or are procedurally defaulted without sufficient cause.

### A. Claims Not Cognizable Under Habeas Rules

Claims 1(c) and 2 are not cognizable under the Habeas Rules.

#### 1. *Claim 1(c)*

Petitioner asserts that post-conviction counsel provided constitutionally ineffective assistance of counsel for 1) failing to subpoena witnesses and effectively question witnesses during his post-conviction proceedings; 2) "with[holding] all appeal briefs" and "den[ying] Petitioner the right to be involved with his case;" 3) "refus[ing] to provide any assistance with anything regarding [Petitioner's] innocence or the misconduct that has taken place;" and 4) failing to "provide

25

audio/video evidence to [the] court." (Doc. No. 37 at PageID# 235; Doc. No. 37-2 at PageID# 250, 252, 301-02).

Claims alleging that post-conviction counsel rendered ineffective assistance are not cognizable under Section 2254. See 28 U.S.C. § 2254(i); see also Coleman v. Thompson, 501 U.S. 722, 752 (1991). That is because there is no constitutional right to an attorney in state post-conviction proceedings. Coleman, 501 U.S. at 752. Thus, Petitioner's claim alleging the ineffectiveness of post-conviction counsel must be dismissed. See Le Hurst v. Holloway, No. 18-6328, 2019 WL 2537927, at *5 (6th Cir. Apr. 15, 2019) (denying Le Hurst's application for a certificate of appealability on multiple claims, including ineffective assistance of post-conviction counsel claim because the claim "does not fall within the limited exception of" Martinez); Lynn v. Donahue, No. 1:14-cv-01284, 2017 WL 5930304, at *10 (W.D. Tenn. Nov. 30, 2017) (dismissing habeas claims based on alleged ineffective assistance of post-conviction attorneys).

2. *Claim 2*

Petitioner alleges in Claim 2 that the post-conviction court judge was "bias[ed], prejudice[d], abused his d[i]scretion, [and] made false statements in the order . . . ." (Doc. No. 37 at PageID# 237; Doc. No. 37-2 at PageID# 247).

Claims challenging state collateral post-conviction proceedings are not matters that can be addressed by way of federal habeas corpus. See Kirby v. Dutton, 794 F.2d 245, 246-47 (6th Cir. 1986) (referred to in this circuit as "The Kirby rule") (explaining that "the scope of the [federal] writ [does not] reach this second tier of complaints about deficiencies in state post-conviction proceedings."). That is because habeas corpus review is not available where a challenge to such post-conviction proceedings is not directly related to the petitioner's detention. Cress v. Palmer, 484 F.3d 844, 853 (6th Cir. 2007); Alley v. Bell, 307 F.3d 380, 387 (6th Cir. 2002). "Because the

result of habeas review of the adequacy of a post-conviction challenge will not result in a release from confinement, the scope of the writ does not include such grounds involving the adequacy of state post-conviction proceedings." Haight v. Parker, No. 3:02-CV-206-S, 2015 WL 13548182, at *112 (W.D. Ky. July 17, 2015) (citing Wright v. Lazaroff, 643 F.Supp.2d 971, 990 (S.D. Ohio 2009); Simpson v. Warren, 662 F.Supp.2d 835, 847 (E.D. Mich. 2009); Rockwell v. Palmer, 559 F.Supp.2d 817, 831 (W.D. Mich. 2008); Huffman v. Brunsman, 650 F.Supp.2d 725, 736 (S.D. Ohio 2008)). Thus, Petitioner's claim concerning the post-conviction court's actions is not cognizable.

      B. Claims Cognizable Under Habeas Rules

Petitioner asserts three claims that are cognizable under the Habeas Rules, but these claims do not afford habeas relief, for the reasons discussed below.

      1. *Ineffective Assistance of Counsel Claims*

In his petition Petitioner asserts two additional claims of ineffective assistance of counsel. Specifically, Petitioner challenges trial counsel's failure to question certain witnesses (Doc. No. 37 at PageID# 235) and appellate counsel's failure to question certain witnesses and "raise any issues the petitioner discussed with him." (Doc. No. 37 at PageID# 235, Doc. No. 37-2 at PageID# 300).

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. See Bell v. Cone, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 686-87 (1984);

27

Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000), cert. denied, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. Bigelow v. Williams, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

A court hearing an ineffective-assistance-of-counsel claim must consider the totality of the evidence. Strickland, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" West v. Seabold, 73 F.3d 81, 84 (6th Cir. 1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision: "was contrary to" federal law as clearly established at the time in the holding(s) of the United States Supreme Court, § 2254(d)(1); "involved an unreasonable application of" such law; or "was based on an unreasonable

determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2).

Thus, where (as here) a claim of ineffective assistance of counsel is raised in a federal habeas

petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather,

"[t]he pivotal question is whether the state court's application of the Strickland standard was

unreasonable." Harrington v. Richter, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in

Harrington:

> This is different from asking whether defense counsel's performance fell
> below Strickland's standard. Were that the inquiry, the analysis would be no
> different than if, for example, this Court were adjudicating a Strickland claim on
> direct review of a criminal conviction in a United States district court. Under
> AEDPA, though, it is a necessary premise that the two questions are different. For
> purposes of § 2254(d)(1), an unreasonable application of federal law is different
> from an incorrect application of federal law. A state court must be granted a
> deference and latitude that are not in operation when the case involves review under
> the Strickland standard itself.

562 U.S. at 101 (internal quotation marks and citation omitted). In other words, Strickland

mandates deference to counsel's decisions, and the AEDPA mandates deference to state courts, so

"[h]abeas claims based on ineffective assistance of counsel are evaluated under a "doubly

deferential" standard. Abby v. Howe, 742 F.3d 221, 226 (6th Cir. 2014) (citing Burt v. Titlow, 571

U.S. 12, 15 (2013)).

The Court now turns to Petitioner's cognizable ineffective-assistance-of-counsel claims.

    a. *Claim 1(a): Ineffective assistance of trial counsel for failing to question*
      *witnesses*

First, Petitioner alleges that his trial counsel was ineffective because he did not question

witnesses Paul Harris and Robert Vaughn. (Doc. No. 37 at PageID# 235; Doc. No. 37-2 at PageID#

247). Neither of these witnesses testified at Petitioner's trial. (See Doc. No. 40-3 at PageID# 549-

50). However, these witnesses testified at Petitioner's post-conviction proceedings. (See Doc. No.

41-3 at PageID# 2765). Thus, Petitioner's claim appears to challenge the effectiveness of his post-

conviction counsel's performance rather than the effectiveness of Petitioner's trial counsel's performance. And to the extent that Petitioner challenges the effectiveness of his post-conviction counsel's performance under Strickland, the Court already has determined that such a claim is not cognizable in this proceeding. See Claim 1(c), supra.

However, a review of the record reveals that, during Petitioner's post-conviction proceedings, Petitioner alleged that his trial counsel was ineffective in cross-examining witnesses during Petitioner's post-conviction proceedings. (See Doc. No. 41-2 at PageID# 2740-41). In particular, Petitioner alleged that trial counsel failed to effectively cross-examine Leangelo Ramey and Bradley Bryant. (Id.) Thus, to the extent that Petitioner's instant claim is the same claim he presented to the state courts during his post-conviction proceedings, Petitioner exhausted that claim.

Petitioner raised the claim during his post-conviction proceedings, and the post-conviction court denied relief. The Tennessee Court of Criminal Appeals affirmed, finding as follows:

> The Petitioner claims that counsel provided ineffective assistance because he failed to effectively cross-examine witnesses, namely co-defendant Leangelo Ramey and Bradley Jaimon Bryant.
>
> In addressing this claim, the post-conviction court observed that choosing which issues to focus on in cross-examination was "the type of strategic decision that a trial court is not to second-guess in the tactical realm." The court also observed that this court on direct appeal had noted that "[a]ll witnesses [in this case] were thoroughly cross-examined." Kevin Lamont French, 2014 WL 3530947, at *13. The court concluded that counsel's "decisions regarding what issues to focus on in cross-examination were reasonable tactical decisions such that his representation did not constitute deficient performance."
>
> At the evidentiary hearing, counsel, an attorney with almost forty years' experience practicing criminal law, testified that he believed that he effectively cross-examined Mr. Ramey. While counsel might not have delved into the minute details now requested by the Petitioner, the record does not indicate that counsel was deficient in his cross-examination. As to Mr. Bryant, the Petitioner admitted at the evidentiary hearing that Mr. Bryant did not identify him as the shooter at trial.

30

Therefore, even assuming there was some deficiency in counsel's cross-examination of Mr. Bryant, such deficiency did not cause him prejudice.

French, 2020 WL 1100765, at *16-17.

The state courts' adjudication of the claim did not result in a decision that was contrary to, or an unreasonable application of, Strickland. Petitioner has not shown that trial counsel's performance with respect to cross-examining Leangelo and/or Bryant fell below an objective standard of reasonableness such that Petitioner was deprived of his Sixth Amendment right to counsel. See Strickland, 466 U.S. at 688.

At Petitioner's post-conviction hearing, trial counsel testified that the defense theory of the case was that co-defendant Ramey stole Petitioner's vehicle, shot the victim, and ran over the victim. Ramey testified at trial that Petitioner picked Ramey up in a burnt orange Buick LeSabre the night before the incident, as well as right after the incident. Ramey further testified that he burned a car for Petitioner because he believed that he would be "dealt with if [he] said anything or [if][he] didn't cooperate with [Petitioner]." Petitioner, however, has consistently maintained that he did not own a Buick LaSabre at the time of the crimes. In keeping with the defense theory, trial counsel employed a careful cross-examination of Ramey. Counsel testified that he "thought [Ramey] was just an incredible liar . . . . And [counsel] enjoyed the opportunity to try to prove he was lying." (Doc. No. 41-3 at PageID# 2952). Trial counsel further testified that more cross-examination of Ramey regarding the Buick LaSabre would have had little effect, if any, on the jury's verdict, given that Petitioner's mother had testified that the family purchased the Buick after the shooting and had attempted to introduce into evidence a bill of sale for the purchase.[3] (See

---

[3] According to Petitioner, "trial counsel testified falsely at [the] post conviction hearing testifying that there weren't any names or numbers on the bill of sale for the Buick Lasabre therefore he did all he could at providing proof." (Doc. No. 46 at PageID# 3492). Petitioner maintains that "[t]he sellers of the vehicle are listed on the front and back of the bill of sale" (id.) and argues that counsel dropped the ball in proving when Petitioner owned the car in question. (See

31

Doc. No. 41-3 at PageID# 2844-45; Doc. No. 40-7 at PageID# 1290). Trial counsel had practiced criminal law for almost forty years and testified that he believed he effectively cross-examined Ramey. <u>French</u>, 2021 WL 11000765, at *16.

As the post-conviction court noted, "[w]hile there are unquestionably a plethora of issues that Petitioner's counsel could potentially have raised during cross-examination, [and] throughout the trial, counsel focused on establishing the defense's theory that Mr. Ramey was a liar and was the individual actually responsible for the victim's death." (Doc. No. 41-2 at PageID# 2740). "Judicial scrutiny of counsel's performance must be highly deferential." <u>Strickland</u>, 466 U.S. at 689. The decisions trial counsel made regarding the defense's theory of the case and the scope of Ramey's cross-examination are exactly the kind of strategic decisions this Court should not second-guess. The Court finds that Petitioner's arguments fall short of meeting his burden of showing that counsel's actions were objectively unreasonable. And because Petitioner has not met the first <u>Strickland</u> prong with respect to this claim, the Court need not look to the second prong. 466 U.S. at 695.

As for witness Bryant, Petitioner believes that trial counsel did not adequately question Bryant regarding the description he gave of Petitioner's physical appearance. Petitioner, conceded, however, that Bryant did not identify Petitioner as the shooter at trial. (Doc. No. 41-3 at PageID#

---

The record shows that, when trial counsel offered the purported bill of sale as defense exhibit 3, the State objected, claiming it had "never seen a copy of this before and pursuant to the motion that was filed pretrial as well as this wouldn't have been properly--." (Doc. No. 40-7 at PageID# 1291-92). Although the trial transcript does not clearly show that the judge refused to admit the exhibit into evidence (<u>see id.</u> at PageID# 1292), in Petitioner's post-conviction hearing transcript, a colloquy between Petitioner and the judge regarding the purported bill of sale makes it clear. Therein, Petitioner conceded that the defense "wasn't allowed to show proof because they state that we didn't show it [the bill of sale] to the State first . . . ." (Doc. No. 41-3 at PageID# 2844). The post-conviction judge corrects Petitioner by pointing out that Petitioner was able to introduce proof in the form of his mother's testimony but not the purported bill of sale she produced because "[t]here's certain rules we have to operate under." (<u>Id.</u> at PageID# 2844-46).

2856). Thus, even if trial counsel's cross-examination of Bryant was deficient in some way, such deficiency did not prejudice Petitioner.

In summary, the Tennessee Court of Criminal Appeals' determination was not contrary to Strickland. Likewise, the Tennessee Court of Criminal Appeals' ineffective-assistance determination was not based on an unreasonable determination of the facts or an unreasonable applicable of Strickland's standards to those facts.

Finally, in Petitioner's Reply to Respondent's Answer, Petitioner alleges that Ramey and Bryant "were not the only witnesses counsel was ineffective for failing to question." (Doc. No. 46 at PageID# 3491) (emphasis in original). Although Petitioner does not explicitly identify who these other witnesses were, Petitioner intimates that trial counsel should have questioned "Mr. Vanburen"[4] about his testimony that "the petitioner was too big" and "the petitioner was not the person [Van Buren] saw kill the victim." (Id.) Presumably then, Petitioner argues that trial counsel was ineffective for failing to call Van Buren to testify at trial on Petitioner's behalf.[5] The Court must determine if this claim is exhausted.[6]

---

[4] The name of this witness appears to be William Van Buren.

[5] Respondent did not address this claim in his Answer.

[6] In his Second Amended Petition for Post-Conviction Relief, Petitioner alleged an actual innocence claim (Doc. No. 41-1 at PageID# 2666) in which he alleged that "[w]itness to the incident William Van Buren was shown a photo spread, including a photo of petitioner, to possibly identify a person driving victim's auto after the incident. Mr. Van Buren specifically excluded petitioner as being the person he saw because 'he was too big.'" (Id. at PageID# 2669). The post-conviction court determined that Petitioner was not entitled to relief on that ground. (Doc. No. 41-2 at PageID# 2751).

Petitioner again raised an actual innocence claim on appeal of the denial of post-conviction relief, and the Tennessee Court of Criminal Appeals determined that Petitioner had waived review of the issue by failing to support his claim in accordance with Tenn. R. Ct. Crim. App. 10(b). French, 2021 WL 1100765, at *20. In any event, the court concluded, because Petitioner had failed to introduce any new scientific evidence that would support his claim of actual innocence, the post-conviction court properly denied relief. Id. Here, Petitioner does not now raise trial counsel's failure to call Van Buren as a witness in support of an actual innocence claim.

33

In his Second Amended Petition for Post-Conviction Relief, Petitioner alleged several instances of ineffective assistance of counsel, but none concerned trial counsel's failure to call Van Buren as a witness. (Doc. No. 41-1 at PageID#2643-2660). During his post-conviction hearing testimony, Petitioner listed his many complaints about his trial, including that he wanted trial counsel to call "William Van Buren" to testify. French, 2021 WL 1100765, at *10. Trial counsel testified that "he was not familiar with a witness named William Van Buren . . . ." Id. at *12. In denying relief, the post-conviction court did not address any claim related to Van Buren.

On appeal of the denial of post-conviction relief, Petitioner raised ineffective assistance claims based on trial counsel's failure to cross-examine witnesses about their physical descriptions of the person they claimed to see shoot the victim. However, Petitioner did not raise a claim of ineffective assistance of counsel based on trial counsel's failure to call Van Buren as a witness for the defense. (See Doc. No. 41-8 at PageID# 3203-04). The Tennessee Court of Appeals did not address any claim based on the trial counsel's failure to call Van Buren as a witness.

Because he has never fully and fairly presented this claim (ineffective assistance of trial counsel for failing to call Van Buren as a defense witness at trial) to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. See Coleman, 501 U.S. at 752-53. Thus, federal habeas review of the claim is barred unless Petitioner can demonstrate that cause and prejudice will excuse the procedural default or that failure to consider the claim will result in a fundamental miscarriage of justice. See Harris, 489 U.S. at 262; Coe, 161 F.3d at 329-30.

The Court understands Petitioner to allege that the ineffectiveness of his post-conviction counsel excuses the default. In other words, Petitioner claims that post-conviction counsel was

ineffective in failing to raise trial counsel's ineffectiveness in failing to call Van Buren as a witness for the defense. Indeed, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Martinez, 566 U.S. at 9.

The Sixth Circuit has directed a district court considering ineffective assistance of counsel claims under Martinez and Trevino to first address whether the petitioner can demonstrate "(1) the absence or ineffective assistance of his post-conviction counsel and (2) the 'substantial' nature of his underlying [ineffective assistance of trial counsel claims]." Woolbright v. Crews, 791 F.3d 628, 637 (6th Cir. 2015). If the petitioner demonstrates these first two elements, the petitioner has established cause to excuse the procedural default, and the district court must then determine whether the petitioner can establish prejudice from the alleged ineffective assistance of trial counsel. See id. If the petitioner successfully establishes cause and prejudice, the final step is for the district court to evaluate the underlying ineffective assistance of trial counsel claims on the merits. See Atkins v. Holloway, 792 F.3d 654, 659-60 (6th Cir. 2015).

In demonstrating a substantial claim of ineffective assistance of trial counsel, the petitioner must prove prejudice under Strickland. See McGuire v. Warden, Chillicothe Corr. Inst., 738 F.3d 741, 752 (6th Cir. 2013) ("To be successful under Trevino, [a petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim." (internal citations omitted)). Under Strickland, a petitioner can prove prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 694. As one court explains:

> The "actual prejudice" requirement of Coleman and the prejudice requirement of Strickland overlap such that in many habeas cases seeking to overcome procedural

default under <u>Martinez</u>, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of <u>Coleman</u>. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

<u>Thorne v. Hollway</u>, No. 3:14-cv-0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014). The Supreme Court has defined this "substantial" showing as requiring a petitioner to show that the claim has some merit. <u>Martinez</u>, 566 U.S. at 14 (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322, (2003)). The threshold inquiry "does not require full consideration of the factual or legal basis supporting the claims." <u>Miller-El</u>, 537 U.S. at 336, 338.

As previously mentioned, the Court is required to undertake a preliminary analysis of Petitioner's underlying ineffective assistance of trial counsel claim to determine whether the claim has some merit. <u>See Martinez</u>, 566 U.S. 1, 14. Here, that underlying claim is that trial counsel was ineffective by failing to call Van Buren as a witness for the defense.

It is true that failure to call favorable witnesses can amount to ineffective assistance where it results in prejudice to the defense. <u>See, e.g.</u>, <u>Towns v. Smith</u>, 395 F.3d 251, 258-60 (6th Cir. 2005) (counsel ineffective for failing to call a witness who could have created an alternative theory of the case). But "defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." <u>Millender v. Adams</u>, 376 F.3d 520, 527 (6th Cir. 2004) (quotation marks and citation omitted). Petitioner here argues that Van Buren's testimony would have exculpated Petitioner. He asserts that Van Buren gave a description of the suspect as being about twenty-five pounds less than Petitioner weighed at the time. During his post-conviction hearing, however, Petitioner acknowledged that "trial counsel said [Van Buren and "other witnesses" Petitioner wanted counsel to have testify at trial] were not needed." <u>French</u>,

36

2021 WL 1100765, at *12. Indeed, "[w]hether to call a witness and how to conduct a witness' testimony are classic questions of trial strategy that merit Strickland deference." Rayborn v. United States, 489 F. App'x 871, 878 (6th Cir. 2012). Petitioner has provided nothing to overcome that deference.

Even if the failure to call Van Buren as a witness was ineffective, Petitioner cannot show prejudice. As the state appellate court noted, there was "overwhelming evidence" against Petitioner. Multiple witnesses saw the victim's car being driven over him. 2014 WL 3530947, at *14. McLemore testified that she saw the victim speaking with Petitioner immediately before the gunshots, and she identified Petitioner ("100 percent sure, no, but I do believe that's the guy I saw" and that "some people you just don't forget") in a photographic lineup shown to her within days of the murder. 2021 WL 1100765, at *2. Ramey testified that Petitioner was in the driver's seat of the victim's car when the victim was run over. Ramey further testified in detail about burning the victim's car at the direction of Petitioner. Other witnesses testified about Petitioner's motive. Amanda Crawford testified that she had dated both men and that the men had an altercation at a party in the weeks before the victim's murder. While she denied seeing appellant with a gun the night of the party, Detective Harris testified that Ms. Crawford had admitted to him during an interview that Petitioner had a gun that night. In addition, Christopher Savage testified about the same altercation and seeing appellant with a gun that night. Detective Harris testified that, while he was at the crime scene, he was told that a 9-1-1 caller had "notified dispatch that the persons responsible for this had arrived in a gold Chevy Trailblazer." Id. at *4. Fingerprints collected from the Trailblazer matched those of Petitioner.

Based on this evidence, Petitioner cannot demonstrate a reasonable probability that, but for some alleged failure on counsel's part to call Van Buren as a witness, the result of his trial would

37

have been different. Therefore, Petitioner cannot show that the underlying claim is substantial; it has no merit. And Petitioner has not shown that he was prejudiced by post-conviction counsel's failure to raise it. Therefore, Petitioner cannot demonstrate cause and prejudice to excuse his procedural default. His ineffective assistance of counsel claim based on trial counsel's failure to call Van Buren as a defense witness is without merit and will be dismissed.

> b. *Claim 1(b): Ineffective assistance of appellate counsel for failure to question witnesses and raise "any issues the petitioner discussed with him"*

Petitioner next alleges that his appellate counsel was ineffective for failing to question witnesses, raise "any issues the petitioner discussed with him", and "abandon[ing] [Petitioner's] ineffective claim." (Doc. No. 37 at PageID# 235; Doc. No. 37-2 at PageID# 300). Petitioner did not raise an ineffective assistance of appellate counsel claim based on the failure to "question witnesses" in the state courts. [7] (See Doc. No. 41-1 at PageID# 2661-62; Doc. No. 41-8 at PageID# 3204). Petitioner's second and third allegations are interrelated and comprise a claim that Petitioner exhausted in the state courts.

On post-conviction review, Petitioner raised a claim that he "received ineffective assistance of [trial] counsel after his conviction because Mr. Vaughn failed to preserve certain issues for appeal by not raising them in his motion for a new trial." (Doc. No. 41-2 at PageID# 2743-46). The state post-conviction court denied relief after a hearing. The post-conviction court found that,

---

[7] In his amended petition, Petitioner does not identify the witness(es) appellate counsel allegedly failed to question or explain what the significance of such questioning would have been. "A reviewing court is not required to construct a petitioner's argument for him or to guess at the meaning of vague allegations unsupported by any specific facts." Helton v. Motley, No. 6:05 452 DCR, 2006 WL 2734458, at *15-16 (E.D. Ky. Sept. 25, 2006) (where petitioner had failed to "present[] any coherent argument" on one claim and had not "adequately presented" argument on another claim, declining to address claims and denying relief). Petitioner's vague allegations likely explain why Respondent failed to address this claim in his Answer.

　　In an attachment to his amended petition, Petitioner elaborates that he believes appellate counsel "kept the plaintiff in the blind about the McLemore interview." (Doc. No. 37-2 at PageID# 300). McLemore is the only witness Petitioner mentions in the context of his allegation that appellate counsel failed to question witnesses. (See id. at PageID# 300-01). The Court has addressed Petitioner's many arguments about McLemore's testimony, and the prosecutor and lead detective's characterizations of that testimony, in prior Memorandum Opinions (see Doc. Nos. 54, 59, 87) and herein. It is the opinion of this Court that Petitioner has been heard on the matter.

although counsel was unable to secure relief on the issues he raised, "the Court cannot find that his decision to raise only what he felt were the strongest issues in the motion for new trial was deficient." (Doc. No. 41-2 at PageID# 2744). Additionally, the court continued, "none of the issues that Mr. Vaughn failed to include in the motion for new trial were so plainly meritorious that it was unreasonable for him not to include the issues." (Id. at PageID# 2744-45).

The Tennessee Court of Criminal Appeals subsequently affirmed on appeal, French, 2020 WL 1100765 at *17-18, finding as follows:

> The Petitioner claims that he received ineffective assistance with regard to his direct appeal because four of the issues presented to this court were deemed to be waived for having not been included in the motion for new trial. It is not entirely clear whether the Petitioner specifically contends that trial counsel was ineffective for failing to preserve the issues in the motion for new trial that were ultimately deemed waived on appeal or that appellate counsel was ineffective for failing to raise the issues preserved in the motion for new trial rather than the issues he raised.
>
> As indicated, on direct appeal, this court determined that four of the issues presented by the Petitioner were waived due to not being included in his motion for new trial: (1) the trial court erred by admitting prior bad act testimony; (2) the trial court erred by admitting a letter purportedly written by the Petitioner; (3) the trial court erred by admitting testimony regarding weapons found in the Petitioner's home; (4) the assistant district attorney general committed prosecutorial misconduct during closing arguments. Id. at *14.
>
> At the evidentiary hearing, trial counsel agreed that this court ruled that some of the issues appellate counsel raised on appeal were waived because they had not been included in the motion for new trial. In addition, trial counsel noted that appellate counsel did not raise some of the issues that trial counsel had raised in the motion for new trial.
>
> In ruling on this issue, the post-conviction court first observed that appellate counsel was not required to "raise every conceivable issue on appeal," and that "[c]ourts are to give 'considerable deference' to appellate counsel's professional judgment with regard to which issues to raise on appeal." The post-conviction court determined that trial counsel's decision to raise only the issues he felt were the strongest in the motion for new trial was not deficient, and that "none of the issues that [counsel] failed to include in the motion for new trial were so plainly meritorious that it was unreasonable for him to not include those issues." The court also determined, assuming arguendo that counsel should have included those issues in the motion for new trial, that the Petitioner was not prejudiced by counsel's

failure to do so. In making this determination, the court relied on its own assessment of the evidence, as well as this court's determination on direct appeal that "plain error review is not proper because in light of the overwhelming evidence against the accused, none of the alleged errors would have 'probably changed the outcome of the trial'; thus, consideration of the alleged errors is not necessary to do substantial justice." Id. (citations omitted).

Likewise, the post-conviction court found that "deference to [appellate counsel]'s decisions in which issues to pursue on appeal is appropriate because those choices were well within the range of competence required of attorneys. None of the issues which the Petitioner claims should have been raised were of significant merit."

Upon review, we conclude that neither trial nor appellate counsel were deficient for raising the issues he each, respectively, discerned as most meritorious. Moreover, because this court on direct appeal declined to review the four issues pointed to by the Petitioner under the plain error doctrine, the Petitioner has not established that this court would have granted him relief on direct appeal had those four issues been properly reserved.

Id. at *17-18.

The state courts' adjudication did not result in a decision that was contrary to, or an unreasonable application of, Strickland. Petitioner has not shown that appellate counsel's performance fell below an objective standard of reasonableness such that Petitioner was deprived of his Sixth Amendment right to counsel. See Strickland, 466 U.S. at 688.

"The right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel." Burger v. Prelesnik, 826 F. Supp. 2d 997, 1011 (E.D. Mich. 2011), aff'd sub nom. Burger v. Woods, 515 F. App'x 507 (6th Cir. 2013) (citing Evitts v. Lucey, 469 U.S. 387, 396 (1985)). However, appellate counsel is not required to raise every nonfrivolous claim on direct appeal. Jones v. Barnes, 463 U.S. 745 (1983); Coleman, 268 F.3d at 430-31. In fact, the process of "'winnowing out weaker arguments on appeal'" is "the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Barnes, 463 U.S. at 751-52).

To succeed on a claim that appellate counsel was ineffective for failing to present a certain argument, a petitioner must overcome the presumption that counsel rendered effective assistance

40

in choosing which issues to press on appeal. <u>Dufresne v. Palmer</u>, 876 F.3d 248, 257 (6th Cir. 2017) (citing <u>McFarland v. Yukins</u>, 356 F.3d 688, 710 (6th Cir. 2004)). "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." <u>Id.</u> (quoting <u>Fautenberry v. Mitchell</u>, 515 F.3d 614, 642 (6th Cir. 2008)) (brackets in original). "[A] petitioner also 'must demonstrate a reasonable probability that, but for his counsel's unreasonable failure to raise [an] issue on appeal, he would have prevailed.'" <u>Id.</u> (quoting <u>Webb v. Mitchell</u>, 586 F.3d 383, 399 (6th Cir. 2009)) (internal quotation marks omitted). The Sixth Circuit has recognized that "it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. In such cases, the petitioner must demonstrate that the issue not presented was clearly stronger than issues that counsel did present." <u>Matthews v. Parker</u>, 651 F.3d 489, 523-24 (6th Cir. 2011) (quoting <u>Smith v. Robbins</u>, 528 U.S. 259, 289 (2000)), <u>judgment reversed on other grounds by</u> <u>Parker v. Matthews</u>, 567 U.S. 37 (2012).

Here, Petitioner cannot make this showing. His appellate counsel raised six errors in Petitioner's motion for a new trial (<u>see</u> Doc. No. 40-1 at PageID# 460-61) and seven issues on appeal. (<u>See</u> Doc. No. 40-17 at PageID# 2360). Appellate counsel was not required to raise every claim Petitioner wanted him to raise. Petitioner has not demonstrated that the issues he believes appellate counsel should have raised but did not raise were clearly stronger than the thirteen issues counsel raised.  <u>See</u> <u>Haynes v. Boyd</u>, No. 1:16-cv-01258-STA-jay, 2020 WL 1977122, at *5 (W.D. Tenn. Apr. 24, 2020) (rejecting claim of ineffective assistance of appellate counsel where Petitioner did not "explain how the as-applied argument he insists counsel should have made was "clearly stronger" than the argument counsel did make). Consequently, Petitioner has not shown that the Tennessee Court of Criminal Appeals' determination that appellate counsel was not

ineffective was an unreasonable application of <u>Strickland</u>'s standard to the facts of this case. Likewise, Petitioner has not shown that the Tennessee Court of Criminal Appeals' ineffective-assistance determination was based on an unreasonable determination of the facts. This claim, too, will be dismissed.

2. *Claim 3: Prosecutorial Misconduct Claim*

Petitioner next asserts that the State committed prosecutorial misconduct during his trial. (Doc. No. 37 at PageID# 238). Petitioner does not elaborate in his petition but, in exhibits submitted in support of his petition, Petitioner alleges that "[e]vidence in the discovery shows State witnesses were committing perjury." (Doc. No. 37-2 at PageID# 299).

During his direct appeal, and post-conviction proceedings, Petitioner alleged prosecutorial misconduct claims. Those claims did not assert, however, that State's witnesses were committing perjury; instead, those claims asserted[8] that the prosecution's "closing argument, which erroneously claimed an eyewitness identified Kevin French as the shooter" constituted reversible error and that prosecution statements made "in the heat of the battle . . . [had] a prejudicial effect on the jury [that was] injurious to [Petitioner's] rights." (Doc. No. 40-17 at PageID# 2360; Doc.

---

[8] Petitioner previously sought an evidentiary hearing on the basis of alleged newly discovered evidence. (<u>See</u> Doc. No. 87 at PageID# 5134). His request related to allegations that the State fabricated evidence. (<u>Id.</u> at PageID# 5133). In denying his request, the Court found that:

> Petitioner raised two claims on post-conviction review regarding McLemore's trial testimony and her identification of Petitioner as the person with the victim when McLemore heard the shooting. Petitioner could have raised a related fabricated-evidence claim, including any claim that he wished to make regarding how this factual issue was presented at the indictment phase to the grand jury. And he could have presented whatever additional evidence that he wished at that time, including new testimony by McLemore. He did not, and he cannot now show that his fabricated-evidence claim relies on "a factual predictable that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2). Neither does he rely on a new rule of constitutional law. <u>Id.</u>

(<u>Id.</u> at PageID# 5135). The Court recognized that, while there is admittedly some overlap, Petitioner's prosecutorial misconduct claim based on the prosecutor's statement during closing argument about McLemore's testimony was not the same as a fabricated evidence claim. (<u>Id.</u> at PageID# 5134). And neither of those claims had anything to do with the assertion Petitioner now makes, that the State knowingly called witnesses who perjured themselves.

42

No. 41-8 at PageID#3204-05). Thus, the exhausted claims concerned the prosecutor's closing argument, not the testimonies of witnesses who, according to Petitioner, perjured themselves.

In Tennessee, a post-conviction petitioner waives a prosecutorial misconduct claim by not presenting it on direct appeal. See Robinson v. State, No. W2022-00048-CCA-R3-PC, 2023 WL 387076, at *7 (Tenn. Crim. App. Jan 25, 2023). Thus, to the extent the prosecutorial misconduct claim raised in Petitioner's instant federal habeas petition differs from the claims he presented to the state courts, that claim is procedural defaulted for lack of exhaustion under Section 2254. See id. (finding prosecutorial misconduct claim waived where the post-conviction petitioner had not raised it in his direct appeal). And because Petitioner has not set forth cause and prejudice to excuse this default, nor has he shown that any failure by the Court to address this claim would be a miscarriage of justice, the Court cannot review the claim.

However, to the extent Petitioner is raising the same prosecutorial misconduct claim that he presented to the state courts, that claim is exhausted. Petitioner raised the claim on direct appeal, and the Tennessee Court of Criminal Appeals deemed it claim waived because Petitioner had not included the claim in his motion for new trial. French, 2014 WL 3530947, at *14; see Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented…"). Dismissal on this procedural ground is an adequate and independent state ground, and that reason is sufficient to foreclose federal habeas review of this claim. See Seymour v. Walker, 224 F.3d 542, 555-56 (6th Cir. 2000). In any event, the appeals court concluded that "plain error review is not proper because in light of the overwhelming evidence against the accused, none of the alleged errors would have 'probably

changed the outcome of the trial[.]'" Id. (citing  State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn.

Crim. App. 1994) (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

When Petitioner raised the claim on post-conviction appeal, the Tennessee Court of

Criminal Appeals addressed it substantively as follows:

> The Petitioner next argues the stand-alone claim that the State committed
> prosecutorial misconduct in closing argument. He "does not contend that any
> intentional misconduct occurred, but that the statements presented as cause were
> made 'in the heat of the battle[,]' ... but that the prejudicial effect on the jury would
> have been no less injurious to his rights[.]" Although the Petitioner does not
> explicitly state so in the argument of his brief, we presume he is referring to the
> State's "mischaracterization" of Ms. McLemore's identification of him as the
> shooter as the misconduct at issue.
>
> The five generally recognized areas of prosecutorial misconduct occur when the
> prosecutor intentionally misstates the evidence or misleads the jury on the
> inferences it may draw from the evidence; expresses his or her personal opinion on
> the evidence or the defendant's guilt; uses arguments calculated to inflame the
> passions or prejudices of the jury; diverts the jury from its duty to decide the case
> on the evidence by injecting issues broader than the guilt or innocence of the
> accused under the controlling law or by making predictions on the consequences of
> the jury's verdict; and intentionally refers to or argues facts outside the record, other
> than those which are matters of common public knowledge. State v. Goltz, 111
> S.W.3d 1, 6 (Tenn. Crim. App. 2003). Tennessee courts "have traditionally
> provided counsel with a wide latitude of discretion in the content of their final
> argument" and trial judges with "wide discretion in control of the argument." State
> v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing
> argument "must be temperate, predicated on evidence introduced during the trial,
> relevant to the issues being tried, and not otherwise improper under the facts or
> law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999).
>
> As summarized above, the record shows that during closing argument, the State
> argued that Ms. McLemore "viewed a photo lineup and was able to identify the
> [Petitioner]." Later, the State commented that Ms. McLemore "identif[ied] the
> [Petitioner] as the shooter." During closing argument for the defense, counsel
> clarified that "Ms. McLemore testified from the stand that she looked at a photo
> lineup[ ] and said she wasn't a hundred percent sure but she circled the face of [the
> Petitioner] and said, it kind of looks like. It resembles him." Counsel also reminded
> the jury that Ms. McLemore said that she only saw the suspected perpetrator "very
> briefly ... it was just an instant."
>
> In ruling on this issue, the post-conviction court determined that "none of the
> statements the Petitioner claims constituted misconduct were actually improper" as

the remarks were "reasonable inferences that can be drawn from the facts." The court also noted that it instructed the jury that the statements of the attorneys did not constitute evidence, and that it was to decide the case on the evidence introduced at trial. The court further determined that even if the prosecutor's remarks were improper, the cumulative effect of the comments was minor, "particularly in comparison [to] the strength of the State's case overall."

The record supports the post-conviction court's determinations. The State's comments during closing argument were not outside the bounds of reasonable inferences from the evidence and were not so inflammatory that they prejudiced the jury. In addition, counsel clarified and counter-attacked the State's comments during his closing argument, and the trial court instructed the jury that it was to base its decision only on the evidence. The Petitioner is not entitled to relief on this issue.

French, 2021 WL 1100765 at *18-19.

The state post-conviction court's rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact in light of the evidence before the state court.

Prosecutorial misconduct claims are "reviewed deferentially on habeas review." Millender v. Adams, 376 F.3d 520, 528 (6th Cir. 2004). On habeas review of a prosecutorial misconduct claim, "the relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). "Even if the prosecutor's conduct was improper or even universally condemned, we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair." Bowling v. Parker, 344 F.3d 487, 512 (6th Cir. 2003).

Here, the record shows that during closing argument, the State argued that McLemore "viewed a photo lineup and was able to identify the [Petitioner]." Later, the State commented that McLemore "identif[ied] the [Petitioner] as the shooter." Petitioner asserts that the State's comments improperly characterized McLemore's testimony and constituted prosecutorial

45

misconduct. Both the post-conviction court and the Tennessee Court of Criminal Appeals determined that nothing said by the prosecution during closing argument was "actually improper." (Doc. No. 41-2 PageID# 2748; French, 2021 WL 1100765 at *18-19). Instead, the state courts concluded that all the State's closing remarks were based on reasonable inferences that could be drawn from the facts.

The record supports the state courts' determinations. The State's comments during closing argument were based on reasonable inferences from the evidence presented at trial and were not so inflammatory that they prejudiced the jury.

Even if the statements constituted prosecutorial misconduct, Petitioner was not prejudiced by them. During closing argument for the defense, counsel clarified that "Ms. McLemore testified from the stand that she looked at a photo lineup[ ] and said she wasn't a hundred percent sure but she circled the face of [the Petitioner] and said, it kind of looks like. It resembles him." Counsel also reminded the jury that Ms. McLemore said that she only saw the suspected perpetrator "very briefly ... it was just an instant." (Doc. No. 40-8 at PageID 1370-71).

Additionally, the Court instructed the jury that it should decide the case on the evidence introduced during the trial, and that the remarks of counsel did not constitute evidence. (Doc. No. 40-8 at PageID# 1440). Thus, even in the event of any arguably improper statement, a curative instruction was given. The jury is presumed to have followed each of those instructions. Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one"); see Goff v. Bagley, 601 F.3d 445, 480 (6th Cir. 2010) (affirming district court's decision that prosecutor's improper, but not flagrant, remarks were addressed by a curative instruction, "which we must assume the jury followed").

Petitioner cannot demonstrate that the state court's disposition in this case was contrary or involved an unreasonable application of any governing legal principles from Supreme Court decisions. The claim will be dismissed.

### 3. *Claim 4: Brady Claim*

Finally, Petitioner alleges that the State withheld evidence in violation of his rights under Brady v. Maryland, 373 U.S. 83. (Doc. No. 37 at PageID# 240). Specifically, Petitioner alleges that the prosecution withheld a surveillance video from a business across the street from the location of the victim's murder. According to Petitioner, the video "exonerates [Petitioner]" by showing "a female identifying the shooter as her boyfriend." (Doc. No. 37-2 at PageID# 305). Petitioner insists he is not the boyfriend of the unidentified female in the video and, therefore, he is not the victim's shooter. Petitioner exhausted this claim.

Petitioner raised this same issue on post-conviction review and, following a hearing, the post-conviction court found that Petitioner had not established a Brady violation because the surveillance footage at issue was not material. (Doc. No. 41-2 at PageID# 2749-51).

The Tennessee Court of Criminal Appeals affirmed on appeal, noting that "Petitioner himself only claims that the surveillance video would have 'led him to additional witnesses that may have had crucial information regarding the events that occurred.'" French, 2021 WL 1100765, at *19-20. The court concluded that, because Petitioner had failed to establish that the footage would have exculpated him or been used to impeach any of the State's witnesses at trial, even if Petitioner had been able to view the video and learn of additional witnesses, the production of that video would not have placed the case in a different light. Id. at *20. This was especially true, the court noted, "in light of the strength of the other evidence supporting the convictions." Id.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Youngblood v. West Virginia, 547 U.S. 867, 870 (2006) (internal quotation marks omitted). As the Supreme Court explained:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678). "[T]he materiality of withheld evidence may be determined only by evaluating the evidence collectively." Castleberry v. Brigano, 349 F.3d 286, 291 (6th Cir. 2003). "Evidence that is 'merely cumulative' to evidence presented at trial is 'not material for purposes of Brady analysis.'" Brooks v. Tenn., 626 F.3d 878, 893 (6th Cir. 2010) (quoting Carter v. Mitchell, 443 F.3d 517, 533 n.7 (6th Cir. 2006)). Materiality for Brady purposes is a "difficult test to meet," and must be determined in light of the totality of the evidence, including the weight of the evidence of the petitioner's guilt. See Montgomery v. Bobby, 654 F.3d 668, 678 (6th Cir. 2011).

Thus, to prevail on a Brady claim, the petitioner must prove that the evidence at issue was favorable to the defense, that the State willfully or inadvertently suppressed the evidence, and that, as a result, the petitioner was prejudiced. Brooks v. Tennessee, 626 F.3d 878, 890 (6th Cir. 2010) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).

Here, there is no proof establishing that the State withheld the video at issue. Petitioner's trial counsel testified that, if the State had a recording of surveillance video from a business near the crime scene, it would have been "up to [him]" to obtain a copy of the recording so that he could determine if the video had any value for the Petitioner's defense." (Doc. No. 41-3 at PageID# 2938). Trial counsel did not recall "a video looking at the car wash" and he did "not recall" getting a copy of any such video. (Id. at PageID# 2937).

Even if the State had withheld such a video, Petitioner has not shown the video is material. Detective Harris testified that he had seen the video, and it did not show the car wash where the homicide occurred; instead, the video only showed the street in front of the car wash. Even ignoring Detective Harris's testimony (which Petitioner challenges), Petitioner concedes that the video does not show the actual crime or the parties actually involved. Petitioner admits that the video would have, at best, "led him to additional witnesses . . . ." (Doc. No. 41-8 at PageID# 3205). Thus, Petitioner has not shown that the result of his trial would have been different, given the other evidence showing Petitioner's guilt.

Accordingly, the state court's rejection of Petitioner's claim was not contrary to, or unreasonable application of, federal law and the claim will, therefore, be dismissed.

## V. CONCLUSION

In summary, Petitioner is not entitled to relief under Section 2254 because each of his four claims either is not cognizable under the Habeas Rules, is without merit, or is procedurally defaulted without sufficient cause. Moreover, Petitioner has not shown that failure to consider his defaulted claims will result in a fundamental miscarriage of justice. The petition therefore is **DENIED** in its entirety. This action is **DISMISSED WITH PREJUDICE**.

In so ruling, the Court notes that it does not write on a clear slate in adjudicating the petition. The Court does not resolve the petition by deciding, for example, whether Petitioner was

49

in fact guilty (and if so, of what), whether Petitioner should have been convicted by the jury (and if so, of what), or even whether it personally believes in the first instance that Petitioner's claims are meritorious. Instead, in the manner discussed herein in detail, it applies established principles to determine the extent to which it can review Petitioner's claims at all, and, for those claims that it determines it can review, it applies the demanding standards of AEDPA.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327. The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the Court will deny a COA. However, Petitioner may seek a COA from the Sixth Circuit.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE